**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WANDA BUTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-07975 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Wanda Butler, brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner"), denying Ms. Butler's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ (I), 423, and 1381 *et seq.* ("Act"). Ms. Butler has filed a motion for summary judgement, seeking to reverse the Commissioner's final decision or remand the matter for additional proceedings [dkt. 23]. For the reasons stated herein, Ms. Butler's motion for summary judgment is granted and the case is remanded to the Commissioner for further proceedings.

## I. PROCEDURAL HISTORY

Ms. Butler filed an application for SSI on April 27, 2007[1] and filed her DIB application on

[1] R. at 124.

April 28, 2007.[2] Ms. Butler alleged an onset date of March 16, 2005.[3] Ms. Butler's applications were denied on October 12, 2007[4] and upon reconsideration on January 29, 2008.[5] Ms. Butler then filed a Request for Hearing before an Administrative Law Judge ("ALJ") on March 18, 2008.[6]

On December 3, 2009, a hearing was held before the ALJ, Sherry Thompson, in Orland Park, Illinois.[7] Following the hearing, the ALJ, issued an unfavorable decision denying Ms. Butler's claim for benefits.[8] Ms. Butler then filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council.[9] Ms. Butler's appeal was denied on January 21, 2010, resulting in a final administrative determination of the Commissioner.[10] On November 9, 2011,[11] Ms. Butler filed her motion for summary judgment. This Court has jurisdiction pursuant to 42 U.S.C. 405(g).

## II. FACTUAL BACKGROUND

At the time of her alleged onset date, March 16, 2005, Ms. Butler was 42 years old.[12] Ms. Butler, at this time, stood at 63 1/4 inches tall, weighed 180 pounds, and had a body mass index of 31.6, which is considered obese.[13] Ms. Butler's highest level of education completed is the twelfth grade and her previous work experience was as a waitress or fast food cook.[14] Ms. Butler has not performed substantial gainful activity since her onset date and was insured for the purposes of DIB

[2] R. at 62.
[3] R. at 62.
[4] R. at 66-69.
[5] R. at 72-4.
[6] R. at 80.
[7] R. at 36-61.
[8] R. at 20-29.
[9] R. at 2-4.
[10] *Id.*
[11] Plt. Mot. 2.
[12] R. at 27.
[13] R. at 23.
[14] R. at 27, 42.

through at least March 31, 2010.[15] Ms. Butler's medical history shows that she has regularly visited several clinics and doctors both prior to and after applying for SSI and DBI. It is clear from the record that she consistently had issues with both lower back and foot pain.

**A. Ms. Butler's Medical History Prior to Filing for Disability**

Ms. Butler has been getting some kind of medical treatment since 2005 for back and foot pain.[16] However, because she does not have insurance, she sporadically visited the Oak Forest Hospital emergency room for treatment prior to applying for SSI and DIB between December 20, 2005 and March 8, 2007.[17] During this time Ms. Butler also visited Joseph Tansey, M.D., to assess her foot and back pain.

**i. Oak Forest Hospital Emergency Room**

Ms. Butler's records show she visited the Oak Forest Hospital emergency room every one to three months from December 20, 2005 to March 8, 2007.[18] Though many of the documents provided from this clinic are not legible, it is clear that Ms. Butler visited regularly. During these visits she had the calluses on her feet shaved and was treated for foot and back pain.[19] Due to the nature of these offices, Ms. Butler did not consistently see the same treating physician.

**ii. Joseph Tansey, M.D.**

In addition to the regular visits to Oak Forest Hospital, Ms. Butler visited one other medical professional prior to applying for benefits: Dr. Tansey. Ms. Butler first met Dr. Tansey on February 27, 2007 and complained of bilateral foot pain (pain all around her foot) that radiates up into the

[15] R. at 20.
[16] R. at 25.
[17] R. at 267-81, 298-334
[18] *Id.*
[19] R. at 267-68, 300, 302, 312, 318.

ankle.[20] Ms. Butler claimed the pain was worse with activity, improved with rest, and was associated with swelling, limping and back pain.[21] To alleviate the pain Ms. Butler stated that she wears cushioned running sneakers, uses orthotics, and uses a cane.[22] Dr. Tansey diagnosed Ms. Butler with bilateral hindfoot arthritis, bilateral equinus, and bilateral hallux valgus with hypermobility.[23] Dr. Tansey recommended both operative and non-operative treatment.[24] Ms. Butler chose non-operative treatment with the understanding that it would likely result in development of arthritis in her ankle joints.[25]

On March 6, 2007, Dr. Tansey had another appointment with Ms. Butler to evaluate her back pain.[26] Ms. Butler stated that the pain in her back was located in the middle, was sharp in quality, and of moderate severity.[27] Ms. Butler stated that her pain did not radiate down her legs and was not associated with any bowel or bladder dysfunction.[28] Dr. Tansey diagnosed her with bilateral hindfoot arthritis, bilateral equinus, bilateral hallux valgus with hypermobility, and low back pain.[29] Dr. Tansey then recommended the same foot treatment options, a home exercise program, continued use of nonseteroidal anti-inflammatory medication, and to follow up with him as needed.[30]

On March 27, 2007, Ms. Butler again met with Dr. Tansey in regards to her lower back pain.[31] During this visit Dr. Tansey found that Ms. Butler's lumbar spine and bilateral lower

---

[20] R. at 297.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] R. at 296.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] R. at 296.
[31] R. at 295.

extremities were essentially unchanged.[32] Dr. Tansey recommended that she avoid exacerbating activity, begin a home exercise program, and follow up with a MRI.[33]

Dr. Tansey then administered a MRI of Ms. Butler's lumbar spine on March 29, 2007, based on Ms. Butler's indication of low back pain.[34] Dr. Tansey indicated the following:

> mild anterior spondylolisthesis of L3 on 4, mild bulge. There is a large amount of ligamentum flavum and fact joint hypertrophic change at this level with a minimal degree of acquired spinal stenosis. At the L5-S1 level there is mild annular bulge with a small just right of midline focal disc protursion. No significant spinal stenosis. Mild bulge at L4-L5, where there is significant narrowing of the intervertebral disc space. This is seen extending into both neural foramina symmetrically, but produces no significant spinal stenosis.[35]

**B. Ms. Butler's Medical History After Filing for Disability**

After filing for SSI on April 27, 2007[36] and DIB on April 28, 2007, Ms. Butler completed a daily living form[37] and met with Stanley Rabinowitz, M.D., at the request of the State of Illinois Disability Determination Services.[38] Ms. Butler then met with two State Agency Reviewing Physician's for medical evaluations. On December 15, 2008, a Medical Expert completed the medical interrogatory physical impairment form for Ms. Butler.[39] Ms. Butler also had an appointment with Dr. Tansey on July 14, 2009, after not seeing him for over two years. Ms. Butler then met with Robin Snead, M.D., who is referred to as her treating physician in much of the record, but whom she visited for the first and only time on August 14, 2009. Finally, the record shows that Ms. Butler continued to visit the Oak Forest Hospital of Cook County emergency room for

[32] *Id.*
[33] *Id.*
[34] R. at 294.
[35] *Id.*
[36] R. at 124.
[37] R. at 178.
[38] R. at 401.
[39] R. at 428.

treatment.

**i. Ms. Butler's Daily Living Form**

Ms. Butler reported in her activities of daily living form, which she filled out for purposes of her application, that she cooks and cleans daily.[40] Ms. Butler also stated she can rake leaves, although it takes her eight hours to do so, and that she rides her bike three to five times weekly.[41] Ms. Butler stated that she has pain and fatigue during these activities and cannot sit, stand or walk for very long without her back getting stiff and experiencing pain throughout her body.[42] Ms. Butler stated that this causes her to have difficulty sleeping as she wakes hourly at night.[43] She further reported that she can lift five pounds, walk fifty feet, and must hold onto furniture or a cane for support when squatting, bending, standing, sitting, walking or kneeling and uses a cane and walker to ambulate.[44]

**ii. Disability Examination**

On September 19, 2007, Ms. Butler was examined at the request of the State of Illinois Disability Determination Services by Stanley Rabinowitz, M.D.[45] Ms. Butler's chief complaint to Dr. Rabinowitz was that of degenerative arthritis.[46] Dr. Rabinowitz reviewed the medical history that was provided to him by Ms. Butler, which consisted of reports by Dr. Tansey, a podiatry consultant and an MRI scan of Ms. Butler's lumbar spine.[47] In his report, Dr. Rabinowitz noted that the patient was currently using a walker for reasons that he found to be unclear.[48] Dr. Rabinowitz was not able

[40] R. at 178.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] R. at 401.
[46] *Id.*
[47] *Id.*
[48] *Id.*

to adequately assess Ms. Butler's knees or hips because Ms. Butler complained of pain during range of motion testing of the knees and hips.[49] However, Dr. Rabinowitz noted that Ms. Butler sat comfortably with the knees and hips flexed to at least 90 degrees.[50] Dr. Rabinowitz then noted that Ms. Butler's grip in both hands was normal and her digital dexterity was not impaired.[51]Ms. Butler had moderately severe difficulty getting on and off the examining table and would not do heel and toe walking or squatting.[52] Based on his examination he further found that the degree of Ms. Butler's complaints appeared out of proportion to the objective findings present and there appeared to be significant symptom magnification.[53]

**iii. State Agency Reviewing Physicians' Findings**

Ms. Butler met with Robert Patey, M.D., on October 4, 2007, for the purpose of filling out a Physical Residual Functional Capacity Assessment form ("RFCA").[54] Dr. Patey diagnosed Ms. Butler primarily with back pain, secondarily with obesity, and noted Ms. Butler also alleged hypertension.[55] Dr. Patey found that Ms. Butler could occasionally lift and/or carry less than ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk at least two hours in a eight hour work day, sit for a total of about six hours in an eight hour work day, push and/or pull but would be limited in this with her lower extremities.[56] He further noted that Ms. Butler may need to change positions occasionally due to back discomfort, that her push and pull with her lower extremities would be limited occasionally due to pediatric problems, and that she could occasionally

---

[49]R. at 403.
[50]*Id.*
[51]*Id.*
[52]*Id.*
[53]R. at 402.
[54]R. at 405.
[55]R. at 405.
[56]*Id.*

climb a ramp/stairs, balance, stoop, kneel, crouch, crawl, but never balance on a ladder, rope, or scaffold.[57] Dr. Patey found no manipulative, visual, or communicative limitations but found that Ms. Butler should avoid extreme cold, hazardous machinery, and heights.[58] Dr. Patay noted on the form that Dr. Tansey did not supply a statement regarding Ms. Butler's physical capacities, however, Dr. Patey was able to conclude that Ms. Butler has persistent back pain.[59] However, some motions were difficult to judge because of what appeared to Dr. Patey to be symptom magnification.[60] Dr. Patey further found that Ms. Butler's lower spine flexed to 80 degrees and extended to 25 degrees, Ms. Butler's hand grip and digital dexterity was normal, imaging showed moderate degenerative change in multiple areas of her back, her neuroglial exams were normal, her feet had calluses and verruca, her hypertension was fairly well controlled, and that she was obese.[61] Based on these findings, Dr. Patey did not believe these issues would impair Ms. Butler from lifting and carrying 20 to 25 pounds for 6 hours out of an 8 hour work day.[62]

Ms. Butler then visited Bharati Jhaveri, M.D., on January 18, 2008, for a reconsideration of Dr. Patey's findings.[63] At this examination Ms. Butler alleged degenerative disc disease, multiple joint arthritis, and lumbar spine and back pain.[64] Dr. Jhaveri noted that he reviewed all of the evidence in the file and the physical RFCA assessment that was completed by Dr. Patey on October 4, 2007.[65] In his explanation Dr. Jhaveri wrote,

> [a] substantive review was made of the initial decision and found the decision

[57]R. at 406-07.
[58]R. at 408-09.
[59]R. at 411-12.
[60]R. at 412.
[61]*Id.*
[62]*Id.*
[63]R. at 413.
[64]*Id.*
[65]R. at 414.

> was correct. The [RFCA] was for sedentary work. At the recon level, the claimant [alleged] a disability for a back problem. She alleges no worsening of her condition, [there] are no new impairments nor any new sources to be contacted. Therefore, the initial claim is being affirmed.[66]

**iv. Medical Interrogatory Physical Impairment Form**

On December 15, 2008, Mr. Latchamsetty, M.D., completed the Medical Interrogatory Physical Impairment form for Ms. Butler.[67] The form indicates that Dr. Latchamsetty was providing the information as an impartial medical expert.[68] Dr. Latchamsetty checked yes on the form indicating that he felt there was sufficient objective medical and other evidence to allow him to form opinions about the nature and severity of Ms. Butler's impairments during the relevant period.[69] Based on Ms. Butler's allegations, the reviewing physicians' findings on examination and reconsideration, medical evidence on file, and Dr. Rabinowitz's findings, Dr. Latchamsetty concluded that the available evidence showed Ms. Butler had chronic foot and back pain and was treated conservatively with no surgical treatment.[70]

Dr. Latchamsetty then noted that even though Ms. Butler was using a walker, objective findings did not support the need for it.[71] Furthermore, Dr. Latchamsetty noted that the fact that the follow up reports were infrequent, with no documentation of significant objective findings on examination of Ms. Butler, and no plan for surgery indicated, Ms. Butler's allegations were only partially credible.[72] Dr. Latchamsetty, thus, found that Ms. Butler's impairments were severe but did

[66]R. at 415.
[67]R. at 428.
[68]*Id.*
[69]*Id.*
[70]R. at 428-29.
[71]R. at 429.
[72]*Id.*

not meet or equal listing 1.02 or 1.04.[73]

Dr. Latchamsetty then completed the Medical Source Statement of Ability to do Work-related Physical Activities form.[74] In it he found that Ms. Butler could occasionally and frequently lift or carry up to 10 lbs but nothing greater,[75] Ms. Butler could stand for two hours at one time without interruption, sit six hours in an 8 hour workday, stand or walk two hours in an 8 hour day, and that Ms. Butler did not require the use of a cane to ambulate.[76] In determining Ms. Butler's use of her hands he found Ms. Butler could reach overhead, reach in all other directions, handle, finger, feel, push, and pull in both hands continuously for over 2 to 3 hours.[77] Dr. Latchamsetty then found that Ms. Butler could occasionally use foot controls with both feet, climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl.[78] Finally, Dr. Latchamsetty found that Ms. Butler could perform activities like shopping, travel without a companion for assistance, ambulate without a wheelchair, walker or cane, walk a block at a reasonable pace, use public transportation, climb a few steps without the hand rail, prepare a simple meal to feed herself, care for her personal hygiene, and sort, handle and use paper or files.[79]

**v. Joseph Tansey, M.D.**

Though Ms. Butler had not seen Dr. Tansey for over two years, on July 14, 2009, Ms. Butler met with him again in regards to her low back pain.[80] Dr. Tansey noted he had last seen her in 2007 for the same issue though he had not proceeded with a steroid injection at that time due to Ms.

[73] *Id.*
[74] R. at 432.
[75] *Id.*
[76] R. at 432-33.
[77] R. at 435.
[78] R. at 435-36.
[79] R. at 438.
[80] R. at 478.

Butler's phobia of needles.[81] Ms. Butler complained of pain in the lower back that radiated down both legs that was sharp in quality and moderate in severity.[82] Ms. Butler said her pain was worse with activity, improved with rest, and associated with occasional limping and decreased function.[83] Dr. Tansey found a slightly decreased range of motion and diffuse mild degenerative changes of Ms. Butler's lumbar spine and, therefore, diagnosed her with low back pain with radiculopathy.[84] Dr. Tansey recommended a stretching program at home, for her to avoid exacerbating activity, a Medrol Dosepak, a follow-up appointment, and gave her a prescription for Ibuprofen.[85]

**vi. Robin Snead, M.D.**

Ms. Butler met with Robin Snead, M.D., for the first and only time on August 14, 2009, yet, throughout the record Dr. Snead is referred to as her treating physician.[86] Dr. Snead filled out a Spinal Impairment Questionnaire regarding Ms. Butler's condition. Dr. Snead found based on his evaluation of Ms. Butler that: she can only sit, stand or walk for one hour in an eight-hour day; must take unscheduled breaks to get up and move around every fifteen to twenty minutes for thirty minutes; he would not medically recommend for Ms. Butler to stand/walk continuously in a work setting; Ms. Butler can occasionally lift or carry ten to twenty pounds but never more than that; Ms. Butler can frequently lift or carry up to 10 pounds and; Ms. Butler can never push, pull, kneel, bend, or stoop.[87] Dr. Snead further found that Ms. Butler's impairments were severe enough to constantly interfere with her attention and concentration, that Ms. Butler's impairments will produce good days

[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] R. at 481.
[86] R. at 485.
[87] R. at 485-492.

and bad days, and that Ms. Butler is likely to be absent from work more than three times a month as a result of her impairments or treatments.[88]

**vii. Oak Forest Emergency Room**

During the time after Ms. Butler applied for SSI and DBI it is clear from the record that Ms. Butler continued to visit the Oak Forest Emergency Room. The ALJ, in her opinion, refers to one record of note during this time period: a follow-up appointment with Dr. Rafiq dated September 28, 2009, where Ms. Butler reported that she felt good.[89]

**C. Ms. Butler's ALJ Hearing**

On March 18, 2008 Ms. Butler filed a written request for a hearing.[90] On December 3, 2009, a hearing was held in Orland Park, Illinois, during which both Ms. Butler and a vocational expert testified.[91] Following the hearing, the ALJ issued her decision on January 20, 2010.

**i. Ms. Butler's Testimony at the ALJ Hearing**

At the hearing, Ms. Butler testified that her disability actually began as early as 1990, however, she continued to work in pain against the wishes of both her doctor and parents.[92] Ms. Butler stated that her ability to do things is limited by her arthritis, which travels from her back up and down her body to her feet and neck.[93] The pain occurs two or three times a week if she stands, sits or lies too long or if she over exerts herself.[94] Ms. Butler testified that she has not had surgery for her back, even though it was recommended to her, because she is scared of surgery.[95] She further

---

[88]R. at 489, 491.
[89]R. at 508.
[90]R. at 20.
[91]*Id.*
[92]R. at 43.
[93]R. at 45.
[94]*Id.*
[95]*Id.*

testified that she has not received physical therapy because it would have required insurance.[96] Ms. Butler was recommended exercises to treat her back by her doctor but was unable to complete them effectively.[97] Ms. Butler also testified that she was prescribed and takes Ibuprofen, Naproxen, and Tylenol III for pain.[98] However, she stated she does not take them everyday, which was encouraged by her doctor, to reduce the risk of ulcers.[99] Ms. Butler was told to take the medication on an as-needed basis and has little to no side effects from it.[100] Ms. Butler also stated she has had issues with weight gain due to depression and has had issues with both her feet due to arthritis and being born flat-footed.[101] Her foot pain occurs daily and she testified that she is able to walk about a hundred feet before she gets tired and her feet begin to hurt.[102]

Ms. Butler testified that she can stand for five minutes or sit for ten to fifteen minutes before experiencing pain in her back.[103] This pain then spreads and causes numbness in her thighs and legs, the sensation of pins and needles, and swelling in her feet due to lack of circulation.[104] Ms. Butler testified that to counteract this she elevates her feet while sitting, however, she still needs to move around after ten to fifteen minutes.[105]

Ms. Butler stated that she moves around her home to watch TV, can cook for herself, completes some household chores, and does go grocery shopping for herself.[106] Ms. Butler testified that she does not have issues showering, shaving or combing her hair except for having to wear

---

[96]*Id.*
[97]R. at 45-6.
[98]R. at 46.
[99]R. at 46.
[100]R. at 51.
[101]R. at 46-7.
[102]R. at 48.
[103]R. at 48.
[104]*Id.*
[105]R. at 48-9.
[106]*Id.*

plastic shoes and using the railing when showering to keep from falling.[107] Ms. Butler testified that she has really bad days two or three times a month where, due to the pain, she has to crawl around the house to get to the bathroom and will not shower or get dressed.[108]

**ii. Vocational Expert's Testimony at the ALJ Hearing**

At Ms. Butler's hearing the Vocational Expert ("VE") was examined by the ALJ.[109] The VE testified that Ms. Butler's past work would be classified as a fast food cook, which is medium and semi-skilled. Her previous work as a waitress was classified as light semi-skilled work.[110]

The ALJ then posed three hypothetical situations to the VE.[111] The ALJ first proposed an individual with Ms. Butler's age, education, and work history and a "[residual functional capacity] to do sedentary work, continuous use of hands, occasional use of her feet, occasional climbing of stairs, never climbing of ladders, ropes and scaffolds; occasional crawling, stooping, crouching, crawling and balancing."[112] The VE found that this hypothetical individual would not be capable of performing any of Ms. Butler's past work.[113] However, the VE stated that there are unskilled occupations an individual with this profile could perform such as the work of an order clerk (1,500 jobs in the Chicago area and Sixcollar Counties), a checker (600 job positions), and an assembler (3,800 job positions).[114]

The ALJ then proposed an individual with all of the limitations above who also had to alternate positions from sitting to standing or walking after every two hours.[115] The VE found that

---

[107] R. at 53.
[108] R. at 54.
[109] R. at 56.
[110] R. at 58.
[111] R. at 58-59.
[112] R. at 58.
[113] *Id.*
[114] R. at 58-9.
[115] R. at 59.

this would reduce the number of positions available to 1,000 order clerk positions, 350 checker positions, and 1,500 assembler positions.[116]

Finally, the ALJ proposed an individual with all of the limitations above who also could only lift ten pounds, sit, stand, or walk for one hour and had to take unscheduled breaks every fifteen to twenty minutes for thirty minutes.[117] The VE stated that for this individual there would not be any work available.[118]

Ms. Butler's non-attorney representative then asked the VE if in addition to the above limitations if the hypothetical person also had to miss work three times per month, if there would be work available.[119] The VE found that this would eliminate all of Ms. Butler's past work as well as all other positions.[120]

**iii. ALJ's Decision**

In an opinion issued on January 20, 2010 the ALJ concluded that Ms. Butler was not disabled within the meaning of the Act.[121] An individual is disabled and eligible for SSI benefits "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...."[122] The substantive requirements for SSI benefits are substantially the same as those for DIB benefits under Title II of the Act.[123]

---

[116] *Id.*
[117] R. at 59-60.
[118] R. at 60.
[119] *Id.*
[120] R. at 60.
[121] R. at 29.
[122] 42 U.S.C. § 1382c (a)(3)(A).
[123] *Blackwell v. Barnhart*, 258 F. Supp. 2d 851, 860 (N.D. Ill. 2003).

To determine whether the impairment renders an individual unable to engage in any substantial gainful employment the Commissioner uses a five-step process.[124] The five-step process is as follows: (1) is the claimant presently unemployed; (2) is the claimant's impairment severe; (3) does the impairment meet or equal one of the specified impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) is the claimant unable to perform his or her past relevant work; and (5) does the claimant's age, education, and past work experience, in reference to the Residual Functional Capacity ("RFC"), enable him or her to do other work.[125] The RFC is that which a claimant can still do despite her physical and mental limitations[126] and is determined by the ALJ who must consider the claimant's ability to lift weight, sit-stand, walk, push-pull, etc.[127] Affirmative answers at any step lead to either the next step of the test, or, if at the third and fifth step, to a finding that the claimant is disabled.[128] Except for step three, a negative answer leads to a determination that the claimant is not disabled.[129]

The burdens of production and persuasion are on the claimant from step one through four.[130] However, once the claimant shows an inability to perform past work at step four, the burden shifts to the Commissioner, at step five, to show that the claimant has the ability to engage in some other type of substantial gainful employment.[131]

In her decision denying Ms. Butler's claim, the ALJ found that Ms. Butler met the insured requirements of the Act through March 31, 2010.[132] Furthermore, she found that Ms. Butler had not

---

[124] *See* 20 C.F.R. § 416.920.
[125] 20 C.F.R. § 416.920(b)-(f).
[126] *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).
[127] 20 C.F.R. § 404.1545(b).
[128] *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998).
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] R. at 22.

engaged in substantial gainful activity since March 16, 2005, the alleged onset date, and had the severe impairments of chronic foot pain, chronic back pain and obesity.[133] The ALJ found that these impairments limited Ms. Butler's ability to perform the full range of basic work activities and were, therefore, severe within the meaning of the Regulations.[134] Although the ALJ found these impairments severe, considered individually and in combination, the ALJ did not find that they met the criteria of any listed impairments described in Appendix 1 of the Regulations.[135] In particular, the ALJ found Ms. Butler could ambulate effectively and found "no nerve root or spinal cord compromise with evidence of nerve root compression."[136] Further, the ALJ found no severe arthritis in a major weight bearing joint.[137] In the case of obesity, the ALJ found that though it can cause limitations of functions and can affect a claimant's ability to perform routine movements and necessary physical activity within the work environment, that Ms. Butler ambulates effectively.[138] Therefore, the ALJ found that none of the severe impairments met or medically equaled one of the impairments in the Regulations.[139]

Thus, the ALJ proceeded to the fourth step of the test, which is to determine whether the claimant is able to perform her past relevant work.[140] This involved evaluating Ms. Butler's RFC based on the record and her testimony and comparing it to the requirements of her past work.[141] In this case determining the claimant's RFC required the ALJ to assess subjective complaints, therefore, she followed a two-step process. First, she determined whether there was an underlying medically

[133]R. at 22.
[134]R. at 22.
[135]R. at 23.
[136]*Id.*
[137]R. at 23.
[138]*Id.*
[139]*Id.*
[140]20 C.F.R. § 404.1520(a)(4)(iv).
[141]*Id.*

determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[142] The ALJ found that Ms. Butler's medically determinable impairments could reasonably be expected to cause the alleged symptoms.[143]

The ALJ then evaluated the intensity, persistence, and limiting effects of Ms. Butler's symptoms on her ability to do basic work activities. The ALJ first considered Ms. Butler's daily living form finding that Ms. Butler could cook and clean daily.[144] The ALJ further noted that Ms. Butler wrote in her daily living form that she could also rake leaves and ride her bike but she experiences pain and fatigue when doing so.[145] The ALJ noted that Ms. Butler alleges she cannot sit or stand for a great deal of time but exercises daily and does chores if necessary.[146] Finally, the ALJ noted that Ms. Butler indicated that she uses a cane and walker to ambulate.[147]

The ALJ then considered Ms. Butler's testimony.[148] The ALJ noted that Ms. Butler stated that she is unable to complete her past work due to arthritis in her feet, she cannot stand, sit or lay down for very long without having pain, she cannot walk for more than 100 feet without becoming fatigued, she shops, cooks, cleans and watches television, is afraid of surgery, and takes naproxen, Tylenol III, and Ibuprofen two to three times a week without side affects.

The ALJ found that "the longitudinal medical evidence of record does not fully support" Ms. Butler's allegations of disability.[149] The ALJ found that the medical evidence showed that Ms. Butler

[142] 20 C.F.R. § 404.1529(b).
[143] R. at 24.
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.*

reported chronic low back and foot pain for twenty years, however, MRI studies of the lumbosacral spine showed minor ailments with a minimal degree of acquired spinal stenosis.[150] The ALJ also found that the medical evidence showed no significant arthritic changes in the ankle joints.[151]

The ALJ then considered Ms. Butler's credibility as it related to her allegations and found that Ms. Butler's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC assessment.[152] The ALJ found Ms. Butler's work history "to her credit" but found no intervening injury or change in her impairments that would explain her change in ability to work.[153] The ALJ further noted that in Ms. Butler's most recent visit with her doctor, prior to this hearing, Ms. Butler stated she felt good.[154] The ALJ stated she considered Ms. Butler's "impairments and subjective complaints and made appropriate accommodations in her [RFC,]" but found no reason to believe Ms. Butler could not continue to work within the confines of the RFC that the ALJ outlined.[155]

The ALJ also found significant inconsistencies between the treatments sought by Ms. Butler and the allegations of severe limitations.[156] The ALJ noted that Ms. Butler did not frequently visit a doctor, when she was treated that her treatment was routine and conservative, and Ms. Butler had rejected any type of surgical intervention or steroid injections out of fear.[157] The ALJ found the rejection of more aggressive treatment undermined her allegations of severe pain and limitations.[158]

The ALJ also found that the clinical findings in Ms. Butler's physical examination did not

[150]R. at 24.
[151]*Id.*
[152]R. at 24-25.
[153]*Id.*
[154]*Id.*
[155]*Id.*
[156]*Id.*
[157]*Id.*
[158]*Id.*

support a finding of total disability.[159] The ALJ pointed out the following from the medical record: Ms. Butler was found to have good strength in her lower extremities and lumbar spine;[160] Ms. Butler was also found to have normal grip and digital dexterity in both hands;[161] and Ms. Butler's motor strength involving the upper and lower extremities bilaterally was normal.[162] The ALJ then stated that though Ms. Butler's knees and hips were not adequately assessed because Ms. Butler complained of pain during testing, Dr. Rabinowitz noted that Ms. Butler sat comfortably with her knees and hips flexed to at least ninety degrees during the examination.[163] Also noted was Dr. Rabinowitz's statement that Ms. Butler used a walker for unclear reasons.[164] Dr. Rabinowitz stated the degree of complaints appeared out of proportion to the objective findings present and there appeared to be significant symptom magnification.[165] The ALJ then held that "if you considered Ms. Butler's reported activities in her activities of daily living form, it corroborates the doctor's opinion," and undermines Ms. Butler's allegations of the severity of her disability.[166] These discrepancies diminished the persuasiveness of Ms. Butler's subjective complaints and alleged limitations.[167]

The ALJ then considered Ms. Butler's medication regimen, which she found further diminished Ms. Butler's credibility due to its infrequent nature.[168] The ALJ concluded that Ms. Butler's extensive daily living activities did not indicate a greater restriction than set forth in the

---

[159]R. at 24-25.
[160]*Id.*
[161]*Id.*
[162]*Id.*
[163]*Id.*
[164]R. at 25.
[165]*Id.*
[166]*Id.*
[167]R. at 25-6.
[168]R. at 26.

RFC and also further discredited her alleged functional limitations.[169] The ALJ found that though Ms. Butler says she does these daily activities with pain that her medication regimen did not support the allegations.[170]

Finally, the ALJ considered the consulting medical sources and the opinions of the state agency consultants.[171] The ALJ gave little weight to Ms. Butler's treating source doctor's opinion.[172] The ALJ stated this was because, "the doctor, who treated the claimant for the first time on that day and has no history with her, apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."[173] Furthermore, the ALJ did not find that the medical evidence of record or Ms. Butler's most recent visit to a doctor, where she reported no pain, supported the treating source doctor's opinion.[174] The ALJ gave great weight to the state agency consultant's opinions and the state agency medical physician who completed the interrogatories because the ALJ found their opinions were consistent with the medical evidence and the most informed.[175]

Based on these findings the ALJ held that Ms. Butler was not totally disabled and was able to sustain competitive work,[176] having the RFC to perform the work of order clerk, checker or assembler.[177]

## IV. STANDARD OF REVIEW

[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] R. at 26.
[177] R. at 29.

The Act authorizes a limited judicial review of the Commissioner's final decision.[178] The Act requires that the Commissioner's decision be sustained if it is supported by substantial evidence.[179] Thus, this Court, will only reverse the Commissioner's findings if they are not supported by substantial evidence or if the Commissioner applied an erroneous legal standard.[180] Substantial evidence, in this context, "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[181] This Court does not substitute its own judgment for that of the ALJ, nor reconsider facts or reweigh evidence.[182] If the Commissioner's decision can reasonably be drawn from the record and is supported by substantial evidence, this Court will affirm the decision, even if some evidence may also support the claimant's position.[183] Furthermore, while the ALJ is not required to address every piece of evidence, she must build an accurate and logical bridge from the evidence to her conclusion.[184] However, if the ALJ commits an error of law, reversal is required unless the error is harmless.[185]

## V. ANALYSIS

Ms. Butler first argues that because the ALJ's credibility determination was premised upon serious errors in reasoning that the ALJ's decision cannot be upheld. Ms Butler additionally argues that the ALJ improperly disregarded the treating source's opinion, failed to have a ME at the hearing, and improperly "played doctor" because she failed to re-contact Ms. Butler's treater.[186] Though we remand only on the basis of the ALJ's credibility assessment, we address each of Ms.

---

[178] 42 U.S.C. § 405(g); *Willis v. Apfel*, 116 F. Supp. 2d 971, 974 (N.D. Ill. 2000).
[179] 42 U.S.C. § 405(g).
[180] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).
[181] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
[182] *Willis v. Apfel*, 116 F. Supp. 2d 971, 974 (N.D. Ill. 2000).
[183] *See* 42 U.S.C. §§ 405(g),1383(c)(3).
[184] *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).
[185] *Mandella v. Astrue*, 820 F. Supp. 2d 911, 921 (E.D. Wis. 2011).
[186] Plt. Mt. 1.

Butler's arguments.

**A. The ALJ's findings regarding Ms. Butler's credibility**

Ms. Butler makes five arguments regarding the alleged errors in reasoning made by the ALJ in making her credibility determination: (i) the objective medical evidence did not corroborate Ms. Butler's testimony as to the intensity, persistence, and limiting effects of her pain; (ii) her reliance on the state agency doctor's notation[187] that Ms. Butler used a walker for unclear reasons; (iii) the inconsistencies between the treatment sought and Ms. Butler's allegations of severe limitations; (iv) the ALJ's determination that although Ms. Butler takes several medications that she takes them infrequently, and (v) Ms. Butler's activities of daily living discredited her alleged functional limitations.

We do not undertake a *de novo* review of the ALJ's credibility determination.[188] Instead, we merely examine whether the ALJ's determination was reasoned and supported.[189] Hearing officers are in the best position to see and hear the witnesses and assess the credibility of their testimony, therefore, we afford their credibility determinations special deference.[190] However, if the ALJ's determination lacks explanation or support it will be reversed.[191]

**i. Ms. Butler's testimony as to the intensity, persistence and limiting effects of her pain.**

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

---

[187]R. at 401.
[188]*Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).
[189]*Id.*
[190]*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).
[191]*Id.*

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC] assessment."[192] Ms. Butler alleges that in assessing Ms. Butler's testimony of pain, the ALJ improperly discredited it simply because there was no objective medical evidence supporting it.[193] Ms. Butler then alleges that the ALJ further failed to discuss the effect obesity had on her other impairments.[194]

The regulations provide that statements about the intensity and persistence of a claimant's pain or other symptoms, or about the effect the symptoms have on the claimant's ability to work, are not to be rejected solely because the available objective medical evidence does not substantiate the statements.[195] And any functional limitations or restrictions related to an individual's symptoms that are reported, which can be reasonably accepted as consistent with the objective medical evidence, should be taken into account in reaching the ALJ's conclusion.[196] Finally, an ALJ must support her opinion with "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[197]

We, therefore, look to what adequate evidence the ALJ outlined in her opinion to support Ms. Butler's lack of credibility. First, the ALJ acknowledged that Ms. Butler's work history was to her credit, having been a waitress despite her consistent back pain. But the ALJ also points out that there was no intervening injury or particular change in Ms. Butler's condition to now explain why she can no longer work.[198] The ALJ then focused on a recent doctor visit where Ms. Butler reported

---

[192] R. at 24-5.
[193] Plt. Mt. 11-2.
[194] *Id.*at 12.
[195] 20 C.F.R. § 404.1529(c).
[196] *Id.* at (c)(2).
[197] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
[198] R. at 25.

feeling good with no pain.[199] This evidence is certainly relevant, as it contradicts Ms. Butler's claim of constant pain. And though, as noted, the ALJ may not reject subjective complaints of pain only because the medical records do not fully support them, the ALJ can "consider them as probative of the claimant's credibility."[200] In addition, the ALJ focused on Ms. Butler's lack of more aggressive treatment, which we address in further detail below.

Ms. Butler does not directly address the comments by the ALJ but, instead, argues that the ALJ should have discussed the medical evidence "combined with the effects of Ms. Butler's obesity"[201] to show that she is incapable of work. We agree that an ALJ must consider any limiting effects of obesity on a claimant's overall condition even if the claimant does not cite obesity as an impairment.[202] But a failure to explicitly consider the effects of obesity may be harmless error when the claimant fails to articulate how her obesity limits her functioning and exacerbates her impairments.[203]

In this case, neither Ms. Butler, nor the medical professionals, explained how her obesity affected her limitations or her inability to work. The record contains references to her weight, and she is consistently considered obese.[204] But it was only through Ms. Butler's non-attorney representative, during the ALJ hearing, that her weight was attributed to her inability to work. And even then, Ms. Butler's representative explained that her weight gain was one of "the significant

---

[199] R. at 508.

[200] *Powers*, 207 F.3d at 435.

[201] Pl's Memo. in Support at 12, dkt. ___ .

[202] *Prochaska v. Barnhart,* 454 F.3d 731, 736–37 (7th Cir.2006); *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir.2000).

[203] *See Prochaska*, 454 F.3d at 736–37; *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004).

[204] R. at 319 (a 2005 Ambulatory Adult Interdisciplinary Assessment documents her weight at 216 pounds); R. at 305 (2006 follow-up notes from Oak Forest Hospital state that Ms. Butler is obese); R. at 402 (State Dr. Rabinowitz's 2007examination notes state that Ms. Butler is obese, weighing 180 pounds); R. at 508 (2009 follow-up notes from Oak Forest Hospital indicate that patient feels good with no pain, and also notes her obesity, weighing 215 pounds).

changes in her life" that attributed to her inability to work, noting that she went from 180 pounds to 210 pounds.[205] But this is not entirely accurate. A closer review of her medical records shows that Ms. Butler had consistent, though not dramatic, weight fluctuation and generally weighed above 200 pounds: in September 2005 she weighed 216,[206] in June 2006 she weighed 217,[207] in August 2006 she weighed 221,[208] in September 2007 she weighed 180,[209] and in September 2009 she was back to 215.[210]

We move, then, to Ms. Butler's argument that the ALJ must consider the combined effect of all of her ailments, whether or not "any such impairment, if considered separately, would be of sufficient severity."[211] In support, Ms. Butler cites to *Clifford v. Apfel*, where the claimant suffered from similar ailments - but also arthritis of the knees and high blood pressure - and was 5'3" and weighed 199 pounds.[212] There, the court held that though the claimant did not reach the weight threshold to meet the obesity Listing,[213] and did not claim obesity as an impairment, the ALJ should have considered her weight and the aggregate effect of her other impairments.[214] Specifically, the court held that the ALJ should have considered the disabling effect of her "weight problem on her overall condition" because it could contribute to the cumulative effect of her other impairments.[215]

To compare, here Ms. Butler claims that the ALJ failed to consider the effect of her obesity

---

[205] R. at 41.
[206] R. at 319.
[207] R. at 305.
[208] R. at 277.
[209] R. at 402.
[210] R. at 508.
[211] 20 C.F.R. § 404.1523.
[212] 227 F.3d at 873.
[213] 20 C.F.R. Part 404, Subpart P, Appendix 1, §9.09 (providing that a woman of Ms. Butler's height is disabled if she weighs 250 pounds and also suffers from either persistent high blood pressure or arthritis in a weight-bearing joint).
[214] *Clifford*, 227 F.3d at 873.
[215] *Clifford*, 227 F.3d at 873.

on her levels of pain. We first note that the ALJ did, indeed, acknowledge Ms. Butler's obesity. She stated that "[d]ue to [Ms. Butler's] obesity, foot and back pain," she limited her to sedentary work.[216] The ALJ also recognized the Social Security Ruling on obesity and included Ms. Butler's body mass index as it was listed at the time of her examination with Dr. Rabinowitz, which was 31.6.[217] (We note that it had changed by the time of her hearing due to her weighing 210 pounds, which equates to a BMI of 37.2, which is Level II[218]). Then the ALJ concluded that because Ms. Butler ambulated effectively, she did not find the listings to have been met.

It is clear from the decision that the ALJ was aware of Ms. Butler's obesity because she found it to be a severe impairment. And Ms. Butler does not specify how her obesity further impairs her ability to work, which would generally lead us to uphold the ALJ's decision.[219] But Ms. Butler speculates that her weight makes it more difficult to stand and walk, and this we do not doubt.[220] Ms. Butler suffers from bilateral hind foot arthritis, therefore, her obesity certainly could contribute to the cumulative effect of her ankle and lower back pain.[221]

More importantly, the Seventh Circuit has taken a hard view of cases where an ALJ has failed to consider the bearing of obesity on other impairments.[222] In fact, the court has stated that in considering the credibility of an obese individual's narrative as to her ability to sit or stand, the ALJ

---

[216]R. at 26.

[217]R. at 23.

[218]SSR 02-1p.

[219]*See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that plaintiff did not specify how his obesity impaired his ability to work, upholding the ALJ's decision on this point).

[220]*See Skarbek*, 390 F.3d at 504(noting same).

[221]*See Id.* (holding that the ALJ should have been alerted by the evidence in the record that obesity could contribute to the cumulative effect of her other impairments).

[222]*See Rider v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011)(holding that the ALJ did not consider obesity and the claimant's knee problems, stating that "[i]t is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.").

must "determine the effect of her obesity on that ability."[223] In this case, even if Ms. Butler's ankle and lower back pain are not that serious in themselves, it could interact with her obesity to make standing and sitting more painful.[224] That deserves, at a minimum, some discussion from the ALJ.

**ii. Ms. Butler's disputed need for a walker.**

Ms. Butler alleges that the ALJ improperly relied on her disputed need for a walker in making her credibility determination.[225] Relying on *Parker v. Astrue,*[226] Ms. Butler takes issue with the ALJ's consideration of Dr. Rabinowitz's observation that Ms. Butler was using a walker for unclear reasons.[227] In *Parker*, the ALJ found that it was "suspicious that the plaintiff uses a cane, when no physician had prescribed a cane."[228] The Seventh Circuit found this reasoning to be absurd, noting that a cane does not require a prescription and, in that case, the cane had been recommended by an occupational therapist.[229]

Here, the ALJ merely repeated what examining Dr. Rabinowitz had noted: that Ms. Butler's need for a walker was questionable. We are not clear, however, how much that factored into the ALJ's decision. On this point, our review shows that Dr. Tansey, in his 2007 report, stated that "nonoperative treatment options for Ms. Butler were orthotics, cushioned sneakers, and *ambulatory assistive devices*."[230] Plaintiff does not refer to this report and there is no reference to it in the ALJ's decision. But it confirms that one doctor potentially supported Ms. Butler's use of a walker. There is also no testimony by her or anyone else about her use of the walker at the hearing. Without more,

---

[223]*See Gentle v. Barnhart,* 430 F.3d 865, 869 (7th Cir. 2006).
[224]*Id.*
[225]R. at 23, 25.
[226]*Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010).
[227]R. at 401.
[228]*Parker*, 597 F.3d at 922.
[229]*Id.*
[230]R. at 386 (emphasis added).

the ALJ's mention of this point does not speak to the overall conclusion that Ms. Butler was not fully credible. Perhaps on remand the ALJ can elaborate or clarify this point.

**iii. Inconsistencies between the treatment sought and Ms. Butler's alleged allegations.**

Ms. Butler alleges that the ALJ improperly found that Ms. Butler's rejection of more extensive treatment meant that she did not suffer from as much pain as she claimed,[231] referring to her rejection of surgical intervention and steroid injections. Ms. Butler relies on a district court's decision in *McGinnis-Overton v. Barnhart*, where the plaintiff had an extensive medical history that included many non-surgical procedures and a "constellation of medication."[232] In that case, the court was merely contrasting the treatment the plaintiff had received with the ALJ's conclusion that she had been treated "on an extremely conservative basis," noting that it was "reluctant to require a plaintiff undergo back surgery" before it could find the plaintiff to be disabled.[233]

In contrast, Ms. Butler has a sporadic medical history and the record indicates several occasions where more aggressive treatments, such as surgery and steroid injections, were recommended, yet she declined.[234] As usual in these cases, however, it is not quite that simple. Our review of the record shows that in 2007 Dr. Tansey - the closest medical professional Ms. Butler had to a treating physician - explained an important point. He stated that the risk of surgery included "the possible development of ankle arthritis approximately 10 to 15 years after surgery."[235] Dr. Tansey

[231]R. at 25.

[232]No. 02 C 5726, 2003 WL 22006252, at *5 (N.D. Ill. Aug. 20, 2003).

[233]*McGinnis-Overton*, No. 02 C 5726, 2003 WL 22006252 at *1, 5 (explaining that the plaintiff had "undergone at least two and perhaps three peidural facet joint blocks, and pelvic traction," as well as taking a "constellation of medication," undertaken a course of physical therapy, and had seen her treating physician on a regular basis in the hopes of gaining some relief for a decade).

[234]R. at 45, 496.

[235]R. at 297.

also explained to Ms. Butler that "continued nonoperative treatment would likely result in development of arthritis in the ankle joint."[236] Both surgery and non-operative treatment were, therefore, not perfect options. Either way, Ms. Butler was at risk for continued difficulties with arthritis.

This is not to say that the ALJ's conclusion was incorrect, that Ms. Butler's "inaction of more aggressive treatment undermines her allegations of severe pain and limitations."[237] Perhaps had she been in more severe pain she would have requested stronger medication or even the steroid injections. That she would try every avenue possible to potentially alleviate her pain is a conclusion within reason, despite her fear of needles.[238] The ALJ's determination that Ms. Butler's treatment was "routine and conservative with medication refills and a recommended home exercise regime" is also reflective of the medical records generally.[239] Courts have acknowledged that an ALJ can reasonably consider a claimant's conservative treatment history, for example, where a claimant declines to pursue more aggressive pain treatment recommended by her doctors.[240] That is precisely what the ALJ did here.

**iv. Ms. Butler's testimony regarding her medications.**

Ms. Butler next alleges that the ALJ improperly discredited her testimony as to her severe limitations based on the fact that she takes her medications infrequently.[241] Specifically, Ms. Butler

---

[236] *Id.*

[237] R. at 25.

[238] *See, e.g., Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004)(noting that it was improbable that the plaintiff would have undergone such significant pain treatment procedures, with heavy doses of strong drugs, only to strengthen her chances of obtaining disability benefits).

[239] *See* R. at 25.

[240] *See Burnam v. Astrue*, No. 10 C 5543, 2012 WL 710512, at *1, *10 (N.D. Ill. Mar. 5, 2012) (holding that there is no basis for second-guessing a ALJ's opinion that a claimant's treatment was conservative when the factual record shows treatment consisting primarily of short-acting pain medication, few physical therapy sessions, and the claimant's decision to decline more powerful medication or aggressive treatment).

[241] R. at 26.

claims that the ALJ ignored that her doctor instructed her not to take medications daily to avoid adverse side effects.[242]

We agree that the ALJ did not mention this fact. Ms. Butler testified that her doctor instructed her not to take "a lot of" her medication because of the risk of getting "an ulcer," so she limited her medication to "two or three times a week."[243] But the ALJ focused on Ms. Butler's testimony that as long as she "takes the medications on a full stomach" she has no side effects.[244] Then the ALJ concluded that the "infrequent use of pain medications without side effects further diminishes her credibility to the severe daily pain allegations and limitation."[245]

We acknowledge that the Social Security Rulings make clear that an ALJ may not draw inferences from an individual's symptoms when it is a result of her failure to pursue regular medical treatment - or in this case medication - without first considering any explanations that may explain that infrequent treatment.[246] Here, the explanation for her infrequent use of medication was the potential for side effects. Yet, Ms. Butler also testified that she had no side effects if she took her medication on a full stomach. We do not believe that it was patently wrong for the ALJ to rely on that testimony.

**v. Ms. Butler's activities of daily living.**

Ms. Butler next alleges that the ALJ improperly found that Ms. Butler's activities of daily living discredited her alleged functional limitations. She also argues that the ALJ placed undue weight on Ms. Butler's household activities in assessing Ms. Butler's ability to hold a job outside

---

[242]R. at 46.
[243]R. at 46.
[244]R. at 24, 26; *see also* R. at 51.
[245]R. at 26.
[246]*See Myles v. Astrue,* No. 11-C-4795, 2012 WL 3961221, *10 (N.D. Ill. 2012)(quoting SSR 96-7p, at *7).

the home.[247] In support, Ms. Butler cites the rule that there is a "difference between a person being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week."[248] Ms. Butler also notes that this Circuit has made it clear that the ability to do intermittent chores around one's home does not demand the same level of exertion as working full-time.[249]

However, the point Ms. Butler alleges is mistaken. Here, the ALJ did not state that because Ms. Butler could do household work that she could hold a job outside the home. Instead the ALJ was discounting Ms. Butler's credibility. The ALJ reasoned that Ms. Butler's ability to complete some household work, without the need for a higher dosage of medication, did not support Ms. Butler's allegations of severe daily pain and limitation.[250] Ms. Butler indicated that she cleans, cooks, shops, exercises, rides a bike and rakes and further advised Dr. Rabinowitz that she was able to perform the usual activities of daily living.[251] When considering a claimant's credibility, an ALJ can consider a claimant's activities.[252] It is important to note that the ALJ did not find that Ms. Butler's activities were commensurate with Ms. Butler's ability to hold a job outside the home, but the ALJ reasoned that Ms. Butler's ability to engage in these activities, without the need for more extensive medical treatment, supported the ALJ's finding that Ms. Butler's testimony was not fully credible.

**B. Disregarding Dr. Snead's Opinion.**

Ms. Butler next contends that the ALJ erred because she gave great weight to the state

---

[247] Plt. Mt. 9.

[248] *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004); *see Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir.2005); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

[249] *Carradine*, 360 F.3d at 751; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Rousey v. Heckler*, 771 F.2d 1065, 1070 (7th Cir. 1985); *Rohan v. Chater*, 989 F.3d 966, 970 (7th Cir. 1996).

[250] R. at 26.

[251] R. at 24, 26, 178-80, 216-26, 401.

[252] *See Archer v. Astrue*, No. 09-4705, 2011 WL 720193, at *1, *11 (N.D. Ill. Feb. 22, 2011).

agency consultant's and medical physicians' opinions but gave little weight to Dr. Snead, who Ms. Butler refers to as her treating physician.[253] SSR 96-6p does not say that a state agency opinion can be given greater consideration than a treating sources opinion "*only* under special circumstances,"[254] as Ms. Butler argues, but instead states that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."[255] One example where this may be appropriate is if the "[s]tate agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source."[256] But SSR 96-6p does not state that this is the only possible example of a situation where an ALJ can give the state agency doctors great consideration.[257]

Here, the ALJ found that the state agency's medical consultant were the most informed based on their completion of the interrogatories and because their conclusions were consistent with the medical evidence.[258] The ALJ found that Ms. Butler's treating source opinion was made by Dr. Snead, who "treated [Ms. Butler] for the first time on [the day the opinion was created] and has no history with her, apparently relied quite heavily on the subjective report of symptoms and limitations provide by [Ms. Butler], and seemed to uncritically accept as true most, if not all, of what [Ms.

[253] R. at 26.
[254] Plt. Mot. 13 (emphasis in original).
[255] SSR 96-6p, 1996 WL 374180, 3 (July 2, 1996).
[256] *Id.*
[257] *Id.*
[258] R. at 26.

Butler] reported."[259] Furthermore, the ALJ found that Dr. Snead's opinion was not supported by the medical evidence of record.[260] Also relevant, "[i]f the treating physician's opinion is inconsistent with the consulting physician's opinion . . . or based solely on the patient's subjective complaints, the ALJ may discount it."[261] This is proper under SSR 96-p2, which states that "[e]ven if a treating source's medical opinion is well-supported," it may not be given controlling weight unless it is also consistent with the other substantial evidence in the case record.[262] Therefore, under SSR 96-6p, the appropriate circumstances existed for the ALJ to give greater weight to the State agency medical consultants. Put simply, an ALJ is not required to accept a doctor's opinion if it is "brief, conclusory, and inadequately supported by clinical findings."[263]

**C. Lack of a Medical Expert at the hearing.**

Ms. Butler next alleged that the ALJ compounded the above error by not having a ME at the hearing to analyze the complete medical record along with Ms. Butler's testimony. Ms. Butler argues that, instead, the ALJ made her own independent medical determination.[264] To support her claim, Ms. Butler cites *Rousey v. Hecker,* where the court found that the ALJ improperly made her own independent medical determinations about the claimant.[265] However, in *Rousey* the ALJ made a determination that if the claimant stopped smoking she could return to work, when the record was devoid of any evidence regarding the prognosis of recovery.[266] Thus, the court held the ALJ

---

[259] *Id.*
[260] *Id.*
[261] *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002)
[262] SSR 96-2p, 1996 WL 374188, 1 (July 2, 1996).
[263] *Gildon v. Astrue*, 260 Fed. Appx. 927, 929 (7th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).
[264] Pt. Mt. 14.
[265] *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985).
[266] *Id.*

improperly made this decision because it was not based on testimony or medical evidence in the record.[267] In this case, the ALJ did not make her own medical determination but relied on the evidence of the state agency consultant's and medical expert's written opinions, which the ALJ found to be the most credible.[268] The ALJ is not required to "obtain medical expert testimony. An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."[269] Here, the ALJ acted within her discretion in declining to call a ME at the hearing because she found the evidence was adequate for her to find Ms. Butler not disabled.[270]

**D. Improperly playing doctor.**

Finally, Ms. Butler contends that the ALJ committed error by rejecting rather than recontacting Ms. Butler's treating source, Dr. Snead, regarding the basis for her RFC assessment as required by social security rules and regulations. SSR 96-p5 states that:

> [b]ecause treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to re-contact the source for clarification of the reasons for the opinion.[271]

Thus, SSR 96-p5 only requires the ALJ to contact the treating source physician if the adjudicator, or ALJ, cannot ascertain the basis of the opinion from the case record.[272] Here, the ALJ states that it is clear from the record that Dr. Snead only treated Ms. Butler one time and had no previous

---

[267]*Id.*
[268]R. at 26.
[269]*Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).
[270]*Id.*
[271]SSR 96-5p, 1996 WL 374183, 6 (July 2, 1996).
[272]*Id.*

history treating her. Furthermore, the ALJ found Dr. Snead relied heavily on the alleged impairments that Ms. Butler provided him and seemed to accept most of this as true.[273] Therefore, the ALJ clearly ascertained the basis of Dr. Snead's opinion, which was Ms. Butler's claims and, therefore, gave Dr. Snead's opinion little weight.[274]

---

[273] R. at 26.
[274] *Id.*

## VI. CONCLUSION

For the reasons set forth, Ms. Butler's motion for summary judgment is granted [dkt. 23] and the case is remanded to the Commissioner for further proceedings.

**IT IS SO ORDERED.**

Date: February 22, 2013

Susan E. Cox
U.S. Magistrate Judge